UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| KIRK CARLSON, | ) Civ. 08-4101-KES<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | ) ORDER DISMISSING MOOT<br>) CLAIMS AND GRANTING |
| DOUGLAS WEBER, Warden;<br>JULIE SPURRELL, Clinical<br>Supervisor;<br>DR. REGIER, Hep C Physician;<br>ROSEANNE GARRISON, Staff<br>Nurse; and<br>JP SYVERSON, Chief Charge<br>Nurse; all in their official and<br>unofficial capacities, | ) DEFENDANTS' MOTION FOR<br>) SUMMARY JUDGMENT<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

Plaintiff, Kirk Carlson, was incarcerated at the South Dakota State Penitentiary when he filed this action. He brings this pro se suit under 42 U.S.C. § 1983 against defendants Douglas Weber, Warden of the South Dakota State Penitentiary; Julie Spurrell, Clinical Supervisor; Dr. Regier, his Hepatitis C physician; Roseanne Garrison, Staff Nurse; and JP Syverson, Chief Charge Nurse. Carlson asserts defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment, and that defendants deprived him of due process of law in violation of the Fifth and Fourteenth Amendments. Defendants move for summary judgment on all

claims, asserting defenses of qualified and sovereign immunity. Carlson seeks monetary damages and injunctive relief.

Because Carlson was released from the South Dakota State Penitentiary on January 29, 2010, this court dismisses his claim for injunctive relief as moot. Defendants' motion for summary judgment is granted as to Carlson's claim for money damages.

## BACKGROUND

The facts,[1] taken in the light most favorable to Carlson, are the following:

Weber is the Chief Warden of the South Dakota State Penitentiary. Spurrell is a registered nurse, employed by the South Dakota Department of Health, who works as a clinical supervisor at the South Dakota State Penitentiary. Dr. Regier is a medical doctor, employed by the South Dakota Department of Health, who provides medical care to inmates at the penitentiary. Garrison and Syverson are registered nurses, employed by the South Dakota Department of Health, who work at the South Dakota State Penitentiary. Carlson asserts defendants' failure to treat his Hepatitis C with drug therapy amounted to deliberate indifference to his medical needs.

---

[1] The relevant background facts are derived from Defendants' Statement of Undisputed Material Facts, Docket 83, as discussed *infra*.

Carlson also argues that defendants denied him due process when he was disciplined for failing to produce a urine sample on June 20, 2007.

Carlson was infected with Hepatitis C when he began his incarceration in 2004.[2] Prior to his incarceration, he had treated his Hepatitis C with drug therapy, specifically Interferon and Ribavirin. He stopped treatment against medical advice before the 48-week treatment period ended. During his initial physical at the penitentiary, Carlson indicated he had a history of Hepatitis C and had been treated with drug therapy. Liver function tests to ascertain the extent of the damages were ordered. Carlson's treating physician began the standard protocol used by the South Dakota Department of Health to treat Hepatitis C.

Dr. Regier began treating Carlson on September 9, 2004. At that time, Dr. Regier reviewed Carlson's Hepatitis C test results and determined they were within normal limits. Carlson continued receiving regular liver function tests to monitor the disease, pursuant to the South Dakota Department of Health protocol for treating Hepatitis C. On January 25, 2005, Carlson

---

[2] Carlson first tested positive for Hepatitis C in 1995. Hepatitis C is an infection caused by a virus that attacks the liver, leading to inflammation. The early stages of the disease are asymptomatic. Between 15 to 20 percent of Hepatitis C infections are cleared by the infected person's immune system, without treatment. The rest develop chronic Hepatitis C and about half experience a decrease in liver function. Only 15 to 20 percent of chronic Hepatitis C sufferers sustain serious liver damage. Stedman's Medical Dictionary 875 (28th ed. 2006).

asked Dr. Regier if he could restart drug therapy. Dr. Regier reviewed his test results, which were within normal limits, and asked Carlson to return for a follow-up visit in one to two months. On March 15, 2005, Dr. Regier rechecked Carlson and found his liver function test results had elevated slightly. Dr. Regier thought the elevation could be due to new medications Carlson was prescribed due to a positive TB test. He ordered additional testing and a follow-up appointment. Dr. Regier and other Department of Health staff continued to treat Carlson's Hepatitis C regularly through examination and liver function tests. Carlson periodically requested drug therapy for his Hepatitis C.

On May 10, 2006, Dr. Regier agreed to request authorization for drug therapy for Carlson despite the fact that he did not qualify. The Department of Health protocol for treating Hepatitis C requires advanced liver disease before drug therapy is ordered. Dr. Regier ordered a liver biopsy and psychological consultation in preparation for the treatment. On May 11, 2006 and January 10, 2007, Carlson signed consent forms for Hepatitis C evaluation and treatment, acknowledging that under the protocol, drug treatment is offered if: the inmate has progressive permanent liver disease, is drug and alcohol free (to be determined by random testing before and during treatment), and does not have any medical condition that is a contraindication to the treatment. The form also specified that treatment

4

could be deferred if Carlson did not cooperate with medical, psychiatric, or mental health treatment. The liver biopsy revealed Carlson was at grade 2, stage 1 level for liver disease. Although this biopsy did not reveal advanced liver disease, as required, Dr. Regier allowed Carlson to receive Hepatitis C drug therapy with Interferon and Ribavirin.

    Carlson began drug therapy on February 28, 2007, and continued without notable complications until June 20, 2007. On June 20, 2007, penitentiary staff asked him to produce a urine sample, which he could not do on request. Failure to produce a urine sample on request is a prohibited act for which inmates may be disciplined. Carlson was then given two eight-ounce glasses of water and placed in a holding cell, where he had four hours to produce a urine sample. Carlson did not produce a urine sample. An employee issued a disciplinary report and provided Carlson with a copy.

    The Unit Disciplinary Committee investigated the charges; Carlson explained he was dehydrated because of his diabetes and high blood pressure. The committee then referred the charges to a Disciplinary Hearing Officer for a hearing. Carlson did not request any witnesses at the hearing, but he did request that his unit coordinator act as his staff representative. At the hearing on June 26, 2007, Carlson admitted he did not produce a urine sample. The hearing officer determined he had committed a prohibited act and imposed a sanction of cell restriction for fifteen days and loss of

commissary privileges for three weeks. Carlson was advised of his right to appeal.

Carlson subsequently filed two Informal Resolution Requests, requesting that the disciplinary violation be dismissed from his record. Carlson asserted that his medications caused a decrease in urine, preventing him from producing a urine sample. Staff reviewed his grievance and spoke with the medical staff. Garrison reported that urinary retention was a side effect of nearly all of Carlson's medicines, but there was no medical reason Carlson could not produce a urine sample. Carlson's request to remove the disciplinary report from his record was denied. Carlson then filed a Request for Administrative Remedy on August 14, 2007, requesting the same relief and stating his medication prevented him from producing a urine sample. Weber denied this request on August 24, 2007, asserting that the unit coordinator's response was reasonable.

After June 20, 2007, when Carlson indicated he would stop taking all of his medications because he was unable to produce a urine sample upon request, Dr. Regier encouraged Carlson to continue with his prescribed medications, telling him that other medications, not his Hepatitis C medications, could be influencing his inability to produce a urine sample. On July 21, 2007, Carlson stopped taking Ribavirin against Dr. Regier's advice. Carlson signed a Release of Responsibility form on August 1, 2007,

indicating his refusal to take his medications as prescribed. Carlson told Dr. Regier he had stopped his Ribavirin on August 8, 2007. At that time, Dr. Regier encouraged Carlson to start taking it and advised Carlson that he could discontinue the other Hepatitis C medication, Interferon, based on Carlson's non-compliance. On September 12, 2007, Dr. Regier noted that Carlson's treatment was compromised by his refusal to take the medications prescribed and his drug therapy was terminated.

In April 2008, Carlson asked to restart his drug therapy treatment. His liver function tests did not indicate advanced liver disease as required for drug treatment. On April 28, 2008, Carlson filed an Informal Resolution Request asking why he could not restart drug therapy. The response stated that Carlson had received drug therapy for Hepatitis C twice, but stopped the treatment against the advice of his doctors on both occasions. Carlson filed a request for an Administrative Remedy on May 2, 2008, requesting drug therapy. Weber responded on May 14, 2008, telling Carlson that Dr. Regier was monitoring his condition and that Carlson was to be tested in November or December. Treatment would be based on the test results. On May 28, 2008, Carlson filed another Informal Resolution Request, requesting that lab tests be done immediately and drug therapy provided as soon as possible. The response stated Carlson's medical provider ordered a lab test. On June 2, 2008, Carlson filed a Request for Administrative

7

Remedy seeking drug therapy. Weber responded that testing had been scheduled for the fall and the doctor's treatment plan had not changed. On September 28, 2008, Dr. Regier reviewed Carlson's liver function test results, which were within normal limits. Dr. Regier found Carlson was not eligible for drug therapy and continued to monitor his liver function.

Carlson attempted to resolve these issues through the penitentiary's internal process, but was unsuccessful. As a result, Carlson filed a complaint alleging due process violations and deliberate indifference to medical needs. Carlson seeks:

> 1. A court order to re-start me back on my Hep C treatment immediately for the full treatment with no repercussions;
>
> 2. To pay all filing fees and court cost [sic] incurred by Kirk Carlson to obtain proper medical care and treatment for Hepatitis C;
>
> 3. To overturn my 5-11 major write-up for "refusing to produce a UA." I was not guilty of "refusing;" and
>
> 4. $25 a day or what the court deems fair and just due to the false statement made by RN Rose Garrison. Also everyone else named in the complaint that would do nothing to correct it that caused me suffering from major depression, fatigue, sleeping all the time and with-holding [sic] possible life-saving medication as punishment.

Docket 40, Amended Complaint. Carlson also sought a preliminary injunction ordering penitentiary officials to provide him with drug therapy for Hepatitis C, which was denied on October 13, 2009. Defendants move for summary judgment on all claims. The Affidavits of James E. Moore

(Docket 97) and Keith Ditmanson (Docket 96) reveal that Carlson was released from the South Dakota penitentiary during the pendency of this motion for summary judgment.

**DISCUSSION**

**I.  Mootness**

Because mootness relates to Article III's requirement of a case or controversy, this court raises the issue sua sponte. *See Gay and Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 365 n.9 (8th Cir. 1988) (noting that mootness may be raised sua sponte and is not waived by a defendant's failure to raise it as a defense). An inmate's release renders moot any claim for injunctive relief relating to his conditions of incarceration. *See Vosburg v. Solem*, 845 F.2d 763, 770 (8th Cir. 1988). *See also Lamb v. Bumpus*, 52 Fed. App'x. 740, 741 (6th Cir. 2002) (holding an inmate's § 1983 claim was mooted by his release); *White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996) (holding an inmate's § 1983 claim for prospective injunctive relief was moot due to his release); *Kanzler v. McLaughlin,* No. 09-cv-00377, 2010 WL 1931026 at *3 (D. Colo. Apr. 14, 2010) (finding prison officials had no obligation to provide the injunctive relief sought because plaintiff was no longer incarcerated). Carlson has two claims for injunctive relief: he seeks an order directing prison officials to "re-start" him on drug therapy for his Hepatitis C and an order overturning his disciplinary write-up for failure to

9

produce a urine sample. Because Carlson is no longer in custody, these claims are moot.

An inmate's claim for monetary damages, however, survives his release from confinement. *Watts v. Brewer*, 588 F.2d 646, 648 (8th Cir. 1978). Carlson seeks "$25 a day or what the court deems fair and just due to the false statement made by RN Rose Garrison." Carlson also seeks damages from "everyone else named in the complaint that would do nothing to correct it that caused me suffering from major depression, fatigue, sleeping all the time and with-holding [sic] possible life-saving medication as punishment." These claims are not moot, even though Carlson has been released. Accordingly, this court considers defendants' motion for summary judgment with regard to Carlson's claims for monetary damages.

## II. Summary Judgment

### A. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986). Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980). The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists. *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002).

Rule 56 of the Federal Rules of Civil Procedure applies to prisoner litigants, despite the liberal construction afforded to their pro se pleadings. *Quam v. Minnehaha Cnty. Jail*, 821 F.2d 522 (8th Cir. 1987). The district court is not required to "plumb the record in order to find a genuine issue of material fact." *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996).

### B. There is No Genuine Issue of Material Fact

Defendants argue that their statement of undisputed facts must be accepted as true because Carlson did not respond as required by the applicable rules of procedure. *See* Fed. R. Civ. P. 56; D.S.D. LR 56.1D. Therefore, defendants assert there is no genuine issue of material fact.

Carlson replied to defendants' summary judgment motion in a letter to this court. Docket 94. He did not controvert any of defendants' statements of fact, but rather restated his claim. Accordingly, under the local rules all facts set forth in Defendants' Statement of Undisputed Material Facts, Docket 83, are deemed admitted. *See* D.S.D. LR 56.1D ("All material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's statement of material facts.") Therefore, no genuine issue of material fact remains.

### C. Claims Against Defendants in their Individual Capacity

State actors may be entitled to qualified immunity in a § 1983 action. *Riehm v. Engelking*, 538 F.3d 952 (8th Cir. 2008). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "To overcome a defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at

the time of the deprivation." *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009). "If there is no constitutional violation, [a court] need not inquire further." *Id.*

1. **Deliberate Indifference**

The Eighth Amendment's prohibition on cruel and unusual punishment obligates prison officials to provide inmates with medical care. "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A claim that prison officials were deliberately indifferent to a prisoner's serious medical needs has both objective and subjective components. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). A plaintiff must demonstrate: "(1) that he suffered from objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000).

Defendants concede that Carlson has a serious medical condition, Hepatitis C. Carlson asserts defendants were deliberately indifferent in failing to treat his Hepatitis C with drug therapy. The record reveals that Carlson was being treated with drug therapy, but Dr. Regier discontinued it after Carlson refused to take the medications or comply with medical orders. Defendants assert that Carlson's Hepatitis C was continually treated, as his

13

liver condition and viral loads were regularly monitored. Thus, what Carlson asserts was a refusal to treat his Hepatitis C was actually a disagreement with the conservative course of treatment imposed pursuant to the South Dakota Department of Health treatment protocol.

"[I]nmates have no constitutional right to receive a particular or requested course of treatment and prison doctors remain free to exercise their independent medical judgment." *Dulany*, 132 F.3d at 1239. Refusing to prescribe an inmate a drug of his choice does not rise to the level of deliberate indifference. *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 795 (8th Cir. 2006) (prison physician who prescribed a new anti-seizure medicine to inmate was not deliberately indifferent even though inmate was previously prescribed a different medication). The record indicates that Carlson did not meet the eligibility criteria for the South Dakota Department of Health protocol on treating Hepatitis C. Carlson did not have advanced liver disease and he had a demonstrated history of noncompliance with treatment. The Eighth Circuit Court of Appeals has upheld the use of a similar Hepatitis C treatment protocol. *See Hines v. Anderson*, 547 F.3d 915, 918, 921 (8th Cir. 2008) (holding prison officials were not deliberately indifferent in failing to provide drug therapy to inmates with Hepatitis C who did not have advanced

liver disease as required by the Minnesota Department of Corrections treatment protocol).³

A number of courts have specifically addressed inmates receiving treatment for Hepatitis C. These courts have found failure to treat an inmate's Hepatitis C with drug therapy is not deliberate indifference. *See Tucker v. U.S. Dir. of Bureau of Prisons*, No. 09-1862, 2010 WL 3033916 (D. Minn. Apr. 21, 2010) (holding prison doctors' refusal to re-start Hepatitis C drug therapy for inmate who started and voluntarily stopped drug therapy was not deliberate indifference); *Pennington v. Kelley*, No. 5:08CV0018, 2009 WL 3010912 (E.D. Ark. Sept. 16, 2009) (holding there was no deliberate indifference to medical needs where Hepatitis C drug therapy was delayed until inmate's liver function declined); *Bailey v. Cnty. of Kittson*, No. 07-1939, 2009 WL 294229 (D. Minn. Feb. 5 , 2009) (same). *See also Floyd v. Chief Med. Dir. of UTMB*, 210 Fed. App'x 387, 388-89 (5th Cir. 2006) (holding prison officials were not deliberately indifferent to inmate's serious medical needs when they refused to treat his Hepatitis C with drug therapy)*; Pickett v. Hubert*, 244 F.3d 136 (5th Cir. 2000) (construing inmate's deliberate indifference to medical needs claim where drug therapy for Hepatitis C was

---

³The South Dakota Department of Health protocol on treating Hepatitis C is based on the Minnesota Department of Corrections protocol. *See Bender v. Regier*, 385 F.3d 1133, 1136 (8th Cir. 2004).

not provided as a disagreement with the treatment); *Troutt v. Corr. Healthcare Mgmt., Inc.,* No. CIV-04-1570-C, 2006 WL 2372987 (W.D. Okla. Aug. 14, 2006) (holding course of treatment for Hepatitis C that included monitoring condition but not drug therapy did not amount to deliberate indifference). Accordingly, defendants' treatment of Carlson's Hepatitis C through monitoring, but not drug therapy, was not deliberately indifferent to Carlson's medical needs. Thus, Carlson has failed to demonstrate a violation of his constitutional rights, as required to overcome the defendants' defense of qualified immunity. *McRaven* , 577 F.3d at 980. Accordingly, this court does not inquire into the second prong of the test for overcoming qualified immunity. *Id.*

### 2. Due Process

Carlson also asserts that defendants deprived him of due process of law when he was placed on cell restriction for fifteen days and denied commissary privileges after he failed to produce a urine sample for analysis. Prisoners' due process rights are curtailed by their confinement. *Sandin v. Conner,* 515 U.S. 472, 485 (1995) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights . . . Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law.") An inmate asserting a due process violation must "identify conditions which

16

impose atypical or significant hardship . . . in relation to the ordinary incidents of prison life." *Orr v. Larkins*, 610 F.3d 1032, 1034 (8th Cir. 2010). "In order to determine whether an inmate possesses a liberty interest, we compare the conditions to which the inmate was exposed . . . with those he or she could expect to experience as an ordinary incident of prison life." *Id.* (quoting *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003)). An inmate does not have a protected liberty interest in avoiding administrative segregation. *Wycoff v. Nichols*, 94, F.3d 1187, 1190 (8th Cir. 1996). Carlson spent fifteen days on cell restriction and temporarily lost his commissary privileges. This discipline did not amount to an atypical and significant hardship.

The procedures afforded to Carlson were also sufficient. Due process requirements "are flexible and depend on a balancing of the interests affected by the relevant government action." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985). In a prison, disciplinary proceedings "take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and have been lawfully incarcerated for doing so." *Id.* The essential requirements for due process in a prison disciplinary action are notice, an opportunity to present evidence resisting the charge, a written decision notifying the inmate of the outcome, and some evidence supporting the decision. *See Louis v. Dept. of Corr. Servs. of Nebraska*, 437 F.3d 697,

700 (8th Cir. 2006); *Espinoza v. Peterson*, 283 F.3d 949, 951-52 (8th Cir. 2002).

The record indicates Carlson received a copy of the disciplinary report, was given an opportunity to describe the incident to the Unit Disciplinary Committee at a hearing, and had the option to appeal the committee's determination. Carlson had a hearing before the disciplinary hearing officer, where he presented evidence resisting the charge of failing to produce a urine sample. The disciplinary hearing officer determined that "some evidence" existed to support the conclusions reached by the Committee and upheld the discipline. Furthermore, Carlson could and did appeal using the administrative remedy process. Because Carlson was provided with adequate due process, he has not demonstrated a deprivation of a constitutional right as required to overcome qualified immunity. *McRaven*, 577 F.3d at 980. This court need not inquire further. *Id.*

Carlson has failed to overcome defendants' qualified immunity defense as to both his medical indifference and due process claims. Thus, defendants are entitled to summary judgment on the suits against them in their personal capacities.

**D.  Sovereign Immunity**

Carlson sues defendants in their official capacities as well. A claim against an individual state actor in his official capacity is in reality a

18

complaint against the state. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (citing *Monell v. New York City Dep't of Social Serv.*, 436 U.S. 658, 690 (1978)). An action is barred by the Eleventh Amendment if the state has not consented to suit because its immunity has not been abrogated by Congress. *See Quern v. Jordan*, 440 U.S.332 (1979) (holding the passage of the Civil Rights Act of 1871 did not abrogate immunity under the Eleventh Amendment). Because South Dakota has not consented to suit, defendants are entitled to summary judgment.

Defendants also argue that in addition to being protected by sovereign immunity, they are not proper parties under § 1983. Neither a state nor its officials acting in their official capacities are considered "persons" who may be sued for money damages under § 1983. *Lapides v. Bd. of Regents*, 535 U.S. 613, 617 (2002); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). *Accord McLean v. Gordon*, 548 F.3d 613, 618 (8th Cir. 2008) (reversing denial of summary judgment for state official under § 1983 even where sovereign immunity was waived by removal to federal court). A state official, however, may be sued in his or her official capacity for injunctive relief under § 1983.[4] *Will*, 491 U.S. at 71 n.10. Because Carlson's claims for

---

[4] Defendants also assert they each lack the necessary policymaking authority to be held liable in their official capacities. Because only injunctive relief could be properly sought against them under § 1983 and Carlson's claims for injunctive relief are moot, the court does not address this argument.

injunctive relief are moot and only his claims for damages remain, defendants are not proper parties under § 1983. Thus, defendants are entitled to summary judgment on their official capacity claims.

**CONCLUSION**

For the reasons stated above, Carlson's claims for money damages are dismissed as moot. Defendants are entitled to the entry of summary judgment in their favor on both the official capacity and individual capacity claims pursuant to Fed. R. Civ. P. 56(c). Accordingly, it is

ORDERED that defendants' motion for summary judgment (Docket 81) is granted.

Dated September 14, 2010.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE